UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | | |
|---|---|---|
| TODD ZETTER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 6: 03-218-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| GRIFFITH AVIATION, INC., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court for consideration of Phantom Leasing's motion for summary judgment [Record No. 77] and Powersource's motions for summary judgment concerning Plaintiffs' contract and tort claims. [Record No. 93, 94] Because there are material issues of fact in dispute regarding the alleged negligent operation of the subject aircraft, the Court will deny Powersource's motion concerning plaintiffs' tort claims. However, with respect to all other claims, factual issues do not preclude summary judgment. Accordingly, the remaining motions will be granted.

## I.    BACKGROUND

This case arises from an airplane crash that occurred in Somerset, Kentucky, on February 16, 2003. Mia Zetter and her four children were returning home after visiting Todd Zetter in Griffith, Indiana. Todd Zetter is Mia's husband, and the father of the four children. Mia Zetter and the children were traveling in a Cessna 421 which was owned by Great Northern Aircraft (the "Great Northern Cessna") and piloted by Shalabh Agarwal. The plane crashed as it was

-1-

making its final approach to the Somerset airport.  Agarwal and another passenger in the front seat (Joseph Maglish) were killed in the collision.  In addition, one of the children, R.Z., was ejected from the aircraft and died.  Mia Zetter and the other three children, M.Z., C.Z. and Z.Z., were injured in the crash.

At the time of the crash, Todd Zetter was a vice president of Powersource, having been hired in that capacity in October of 2002.  At the time of the accident, he was second in the Powersource corporate hierarchy, ranking only behind Alfred Bakos, the president of Powersource.  Bakos was also president of Phantom Leasing.

Powersource is an Indiana corporation that provides services and coordination in the trucking industry.  Phantom Leasing is an Indiana corporation that buys and leases semi-tractors to drivers who wish to become owner-operators.  Most of these owner-operators then contract with  Powersource to obtain loads for delivery.  Griffith Aviation is the fixed base operator at Griffith Airport in Griffith, Indiana.

To entice Todd Zetter to agree to work in Griffith while his family remained behind in Somerset, a "Temporary Travel Arrangements" clause was included in his employment contract. This provision allowed Todd Zetter to fly home on weekends or the rest of his family to fly to Griffith.  In either circumstance, Todd Zetter would speak with Lisa Premil, an administrative assistant for Powersource, to arrange the flights.  In essence, Mr. Zetter would give her the dates of the flights and Premil would then arrange the details of the trip.

Premil would obtain approval for the trips from Bakos, and would then contact Griffith Aviation.  Normally, Griffith would provide the pilot, and the Zetters would fly on a Bonanza

airplane owned by Bakos or on a Cessna 421 owned by Phantom Leasing.  Despite the fact that Todd Zetter worked for Powersource, Phantom Leasing would normally be sent an invoice for the pilot time and fuel, which it would pay.  Later, it would settle-up with Powersource for the expense incurred.

On the weekend in question, Paul Goldsmith, a Griffith pilot, picked-up Mia Zetter and her children in Somerset on February 11, 2003, delivering them safely to Griffith, Indiana.  Prior to the return flight on February 16, 2003, Todd Zetter brought his wife and children to Griffith airport for the return flight, arriving at approximately 5:00 p.m.  Todd Zetter then assisted the pilot (Agarwal) in loading the family's baggage into the Great Northern Cessna.  The flight departed at 5:30 p.m., but crashed at 8:02 p.m. on final approach into Somerset.[1]

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Once a moving party has met its burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.' "  *Keeneland Ass'n, Inc. v. Earnes*, 830 F.Supp. 974, 984 (E.D.Ky. 1993), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The moving party bears the initial burden of informing the court of

---

[1]    For the complete designation of the evidence in the case to this point, *see* Record Nos. 95, 96, 99, 101.

-3-

the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415 (6th Cir. 2002).

Once the movant has satisfied this burden, the non-movant must go beyond the assertions made in the pleadings and come forward with specific evidence to demonstrate that there is a genuine issue of material fact. *Id.* The nonmoving party cannot rely upon the assertions in its pleadings. Instead, that party must come forward with probative evidence, such as sworn affidavits to support its claims. *Celotex*, at 324. However, the trial court does not have a duty to search the entire record to establish that it is bereft of any genuine issue of material fact. *In re Morris*, 260 F.3d 654 (6th Cir. 2002). Rather, the nonmoving party has an affirmative obligation to direct the court's attention to those specific portions of the record upon which it seeks to rely to create genuine issues of material fact. *Id.*

Upon review of all the evidence relevant to the motion for summary judgment, a district court should, after viewing the evidence in a light most favorable to the nonmoving party, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993); *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991), *cert. denied*, 117 L. Ed. 2d 624, 112 S. Ct. 1481 (1992). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. "The inquiry performed is the threshold inquiry of determining whether there is the need for trial – whether, in other words,

there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250; *Stein v. National City Bank*, 942 F.2d 1062, 1064 (6th Cir. 1991). In making this determination, the Court must review all the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

## III.   ANALYSIS

### A.   Plaintiffs' Contract Claim against Powersource

As a preliminary matter, the parties contend that the Court must determine as an initial matter whether Todd Zetter can advance both a contract and tort claims based upon the same injury. In addressing Zetter's contract claim against Powersource, the Court will apply Indiana law pursuant to a choice of law agreement contained in the employment contract between Zetter and Powersource. [Record No. 96, Ex. 9] Powersource contends that, under Indiana law, "recovery for personal injuries on a contract claim is generally permissible only when the particular injury was within the parties' contemplation during contract formation," *citing Hopper v. Colonial Motel Properties, Inc.*, 762 N.E.2d 181, 187 (Ind. Ct. App. 2002). [Record No. 93, pg. 5] Because Todd Zetter was not on the flight, he cannot sustain any personal injuries. Moreover, Powersource argues that the Employment Agreement does not contemplate personal injury or death as a result of any breach of the Employment Agreement.

Contrary to the Plaintiffs' assertion, Powersource implicitly agrees that Indiana law permits a party to plead in both contract and tort. [Record No. 100, pg. 20] However, it argues that a plaintiff must show personal injury contemplated by the contract to maintain the contract

-5-

claim, again citing *Hopper*, 762 N.E.2d at 187. [Record No. 93, pg. 5]. In *Hopper*, the Indiana Court of Appeals upheld a trial court's determination that an accidental gun shot wound to a guest was not foreseeable at the time the parties entered into a lodging contract. One of the Hoppers claims against the motel was that the hotel's failure to clean and inspect the rooms resulted in the illegal activity that led to the discharge of the firearm which struck Mrs. Hopper. In upholding the trial court's determination, the Indiana Court of Appeals determined that "recovery for personal injuries on a contract claim is generally permissible only when the particular injury was within the parties' contemplation during contract formation." *Id.*, *citing Johnson v. Scandia*, 717 N.E.2d 24, 31 (Ind. 1999).

Under Indiana law, courts are instructed to "interpret a contract so as to ascertain the intent of the parties." *First Federal Sav. Bank v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind. 1990). Courts "attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties." *Id., citing Shahan v. Brinegar*, 390 N.E.2d 1036, 1041 (Ind. Ct. App 1979). In other words, "the intent of the parties [is] determined from within the 'four corners' of the instrument." *Orkin Exterminating Co. v. Walters*, 466 N.E.2d 55, 60 (Ind. Ct. App. 1984).

Here, it is unclear whether the parties contemplated the possibility of an airplane crash when they were negotiating this part of Zetter's compensation. Certainly, all parties would have been aware that airplanes sometimes crash. But it also appears that Todd Zetter was aware that Powersource was using an outside contractor to provide pilot services. This meant that no employee of Powersource would be flying the plane. Thus, plaintiffs' contention that "[o]ne

-6-

who contracts to perform a service may commit [] a breach of contract . . . if he negligently fails to perform in a workmanlike manner" might be appropriate with respect to Griffith, but not as to Powersource.  [Record No. 100, pg. 21] (internal citations omitted).

Moreover, one of the reasons Indiana law allows plaintiffs to seek recovery in both tort and contract is that its courts recognize "the ridicule the distinction [between tort and contract] receives."  *Foster v. Evergreen Healthcare Inc.*, 716 N.E.2d 19, 23 (Ind. Ct. App. 1999).  For Indiana courts, this distinction appears to be between "complete nonperformance of a promise" (contract) and "defective performance" (tort).  *Id.*  Plaintiffs, therefore, are allowed to plead both that the defendant failed to perform (i.e., breached the contract) and that it performed, but did so negligently (tort).  Because of this distinction, the Zetters argue that they may advance both their claim that Powersource failed to provide a "company owned or leased" plane, and that the transportation it did provide (in terms of the pilot chosen, the actual plane, any specific requests for equipment) was chosen negligently.

In addition, although Powersource does not argue as much, this contention implicitly incorporates Powersource's later assertion that the other members of the Zetter family are only incidental – not intended – third-party beneficiaries.  As incidental beneficiaries, they do not have standing to sue for a breach of Todd Zetter's employment contract.  [Record No. 93, pgs. 10-14]  In *Luhnow v. Hort*, 760 N.E.2d 621 (Ind. Ct. App. 2001), the Indiana Court of Appeals recites the three-part test for determining whether a third-party beneficiary may enforce a provision of the contract.  It held that, to enforce the contract, there must be: (1) a clear intent to benefit the third-party; (2) a duty imposed on one of the contracting parties in favor of the

-7-

third-party; and (3) performance necessary to render the intended benefit to the third-party. *Id.*
at 628.

Because the provision of the contract requiring transportation on "company owned or
leased aircraft" cannot be the basis of liability for a number of reasons, the Court need not decide
whether both the contract and tort claims can proceed in this action.  Likewise, the Court need
not decide whether all of the plaintiffs have standing to enforce provisions of Todd Zetter's
employment contract.  For purposes of deciding the motions for summary judgment, the Court
will assume – without deciding – that both the tort and contract claims could be maintained in
this action.

> **1.    The provision for a "company owned or leased" aircraft created no
> legal duty that Todd Zetter could enforce.**

Although neither party has addressed this issue, the Court finds it to be of particular
significance that the provision plaintiffs are trying to enforce (i.e., "company owned or leased
aircraft") was clearly included in the contract as a limitation on the benefit to Todd Zetter in his
employment agreement.  As discussed above, the provision of a company owned aircraft is listed
between two limitations on Zetter's right to transportation: "limited to one round trip per week"
and "subject to availability".  [Record No. 96, Ex. 9]  "In interpreting a written contract the court
will attempt to determine the intent of the parties at the time the contract was made as disclosed
by the language used to express their rights and duties." *First Federal Sav. Bank v. Key Markets,
Inc.*, 559 N.E.2d 600, 603 (Ind. 1990), *citing Shahan v. Brinegar*, 390 N.E.2d 1036, 1041 (Ind.
Ct. App.1979).

In interpreting the "four corners" of the contract, the Court is mindful of the words chosen by the parties as well as the location of the "Temporary Travel Arrangements" provision within the compensation section of the contract. *Orkin*, 466 N.E.2d 55. Because the requirement that travel be on "company owned or leased aircraft" is a limitation on the provision of travel which Powersource was required to provide, it was intended as a benefit to Powersource. It does not, therefore, create a legal duty from Powersource to Zetter which Zetter could seek to enforce, or that Powersource could breach.

Because this provision was for Powersource's benefit, only Powersource could waive the provision. Powersource was not obligated to provide air travel *except* on "company owned or leased aircraft". The fact that it chose to provide travel on other planes might have allowed Zetter to assert claims of equitable estoppel if Powersource ever denied Zetter's request for travel due to aircraft unavailability. *Binder v. Benchwarmers Sports Lounge*, 833 N.E.2d 70, 73 (Ind. Ct. App. 2005). In other words, having provided non-company aircraft travel before, Powersource might have been equitably estopped from denying such transportation in the future.

However, it is an unacceptable leap from that particular aspect of waiver to an argument that provision of non-company aircraft (which Powersource was not required to do) constituted a breach of the employment agreement. Zetter argues that both he and Bakos intended this to be a benefit to Zetter – that is, that company aircraft would be safer than other commercially available planes. [Record No. 100, pg. 4] However, the Court must interpret the parties' intentions based on the language of the document. In reading the contract, it is clear that while the first sentence ("The Company will provide. . .") enumerates the benefit of free air transportation to Todd Zetter or his family, the remaining sentences are limitations on this

benefit.  The second sentence limits the travel to one round trip per week while the last sentence makes it clear that the benefit does not accrue; that it, it is provided on a "use or lose" basis.

Thus, listed in between the once a week limitation and the "use or lose" limitation, the third sentence containing the "company owned or leased aircraft" provision can only be read as a limitation.  Indeed, the second half of the sentence makes the provision "subject to availability" and gives the company priority of use.  The only reasonable reading of the contract language leads to the conclusion that the parties intended the provision of only "company owned or leased aircraft" as a limitation on the benefit to travel.  Clearly, Powersource did not want to be responsible for the cost of large commercial travel in the event a company plane was unavailable, nor did it want to be responsible chartering a plane under those circumstances.

A party may enforce any provision of a contract which grants it a right against one who bears the resultant obligation or duty.[2]  However, the opposite is also true: a party who bears the obligation cannot require the party granted the right to exercise that right.  *Clark v. West*, 193 N.Y. 349, 358-359 (N.Y. 1908).   Under this rationale, Todd Zetter cannot claim that Powersource's provision of a non-company owned plane when it had no obligation to do so was a breach of his employment contract.  Therefore, as a limitation placed in the contract for the benefit of the Powersource, Zetter cannot claim the provision created a legal duty due him by Powersource.  Where there is no legal duty, there can be no breach.  Powersource cannot be found liable for waiving a provision intended for its own benefit.

---

[2]     This rule applies unless the party asserting the right has previously waived that right. *Binder*, 833 N.E.2d at 73. ("Equitable estoppel is 'the doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he otherwise would have had.'"); *citing* Blacks Law Dictionary 538 (6th ed. 1990).

-10-

**2.      Any requirement of a "company owned or leased" aircraft was waived by the Zetters through their course of conduct.**

Plaintiffs also argue that the "company owned or leased aircraft" language was included in the contract for the benefit of the Zetters as a way to ensure that the aircraft would be of good condition and (presumably) safer than other available aircraft.  [Record No. 100, pg. 4]  This argument is based on extrinsic evidence of Bakos' general intent in including the transportation provision.  But because the Court must judge the intent of the parties from the four corners of the document and not on extrinsic evidence, this argument fails.  *Orkin*, 466 N.E.2d at 60. However, even assuming that the contract demonstrated this intent, and that the "company owned or leased aircraft" provision was intended for the Zetters benefit, the plaintiffs waived this requirement through their course of conduct.

It is a well-settled rule of contract law that, with a few exceptions, a party can waive a requirement intended for its benefit:

> A condition of a promisor's duty can be eliminated by a mere voluntary expression of willingness to waive it, if its performance does not constitute a material part of the agreed equivalent of the promise and its nonperformance does not materially affect the value the promisor received.

8-40 Corbin on Contracts § 40.2; *cited by Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388 (7th Cir. 1995).

In this case, the plaintiffs have done more than express a willingness to waive the requirement of company owned aircraft.  As the defendant details in its brief, both Todd Zetter and the other members of his family traveled on non-Powersource aircraft on numerous occasions.  [Record No. 93, pgs. 7-8]  This includes travel on the Great Northern Cessna, the plane involved in the crash.  *Id.*  Indeed, there is evidence that the Zetters preferred the Great

-11-

Northern Cessna to the Bonanza because of its increased cargo space and because the whole family could travel together in the passenger areas. [Record No. 100, pg. 13] Therefore, unless the plaintiffs can demonstrate that travel on company aircraft was a material part of the benefit they received from the transportation provision, their conduct demonstrates a willingness to waive that requirement.

The plaintiffs have not provided any evidence that Powersource's provision of travel was detrimentally affected by the use of non-company owned aircraft. Indeed, given that under the terms of the transportation provision Powersource retained the right to deny travel if company planes were unavailable, the use of substitute aircraft substantially enhanced the value of the transportation provision to both Todd Zetter and his family. Where a plaintiff "continu[es] to render his own performance or continu[es] to receive further performance from the other party, with knowledge that the condition has not been performed," he has waived any right to require that contract condition in the future. 8-40 Corbin on Contracts § 40.4. Here, the plaintiffs never objected to the use of substitute aircraft, including the Great Northern Cessna. [Record No. 96, Ex. 12, Interrog. No. 16] Thus, even if the "company owned or leased aircraft" was intended for their benefit, their conduct demonstrates a willing waiver of the requirement.

### 3.   Powersouce substantially performed. Additionally, further performance was made impossible by the acts of a third-party.

Powersource also argues that it cannot be held liable under a breach of contract theory because it has substantially performed in providing transportation back to Somerset on the date of the crash. [Record No. 93, pgs. 8-9] Separately, they argue that any nonperformance was the result of choices made by Agarwal and Griffith Aviation. *Id.* These arguments, however, are

inextricably linked.  Powersource performed all of the terms of the agreement which it was able

to perform.  Any nonperformance on its part was excused for impossibility because of choices

made and actions taken by a third-party.  The plaintiffs respond that "mere scheduling of the

flight" was not substantial performance because the plane crashed before reaching the airport in

Kentucky.   [Record No. 100, pgs. 18-19]   However, the plaintiffs have not addressed

Powersource's argument that any nonperformance should be excused due to impossibility.

Recently, the Indiana Supreme Court has embraced an understanding of substantial

performance that is similar to the *de minimis* doctrine.  "[S]ubstantial performance [is the rule]

that minor irregularities that do not affect the finished product do not provide the basis for a

lawsuit."  *D & M Healthcare v. Kernan*, 800 N.E.2d 898, 901 (Ind. 2003), *citing* Max L. Veech

& Charles R. Moon, *De Minimis Non Curat Lex*, 45 Mich. L. Rev. 537, 549 (1947).

Powersource provided the Zetters with a pilot with whom they had flown before and with

an aircraft they had used before.  The fact that the plane did not safely reach the airport was pilot

error, according to plaintiffs' expert Joseph P. Keating.  [Record No. 95, pg. 17; Record No. 96,

Ex. 24]  Therefore, to the extent that Powersource did not perform under the employment

agreement, it was because complete performance was made impossible by the act of a third-

party.

> Where, after a contract is made, a party's performance is made impracticable
> without his fault by the occurrence of an event the non-occurrence of which was
> a basic assumption on which the contract was made, his duty to render that
> performance is discharged, unless the language or the circumstances indicate the
> contrary.

Restatement 2d of Contracts, § 261.  "Events that come within the rule stated in this Section are

generally due . . . to acts of third parties."  Comments to Restatement 2d of Contracts, § 261.

**4.     Even if a duty existed and Powersource breached that duty, the failure to provide a "company owned or leased aircraft" was not a "substantial factor" of the Zetters' injury.**

Any action in contract requires the existence of a contract, the defendant's breach thereof, and damages. *Holloway v. Bob Evans Farms*, 695 N.E.2d 991, 995 (Ind. Ct. App. 1998). In addition, the plaintiff must prove that "defendant's breach of contract was a 'substantial factor' contributing to her damages." *Id., citing Fowler v. Campbell*, 612 N.E.2d 596, 602 (Ind. Ct. App. 1993). "The test of causation in common law contract actions is not whether the breach was the only cause, or whether other causes may have contributed [to the harm], but whether the breach was a substantial factor in bringing about the harm." Fowler, 612 N.E.2d at 602, *citing Krauss v. Greenbarg*, 137 F.2d 569, 572 (3rd Cir. 1943), *cert. denied*, 320 U.S. 791. *Greenbarg* defines a substantial factor as "conduct [having] such an effect in producing the harm as to lead reasonable men to regard it as a cause." *Id.* at 572. Recognizing this definition is vague at best, the court notes that a substantial factor in contract would require more culpability than in tort before a defendant would be liable. *Id.* at footnote 4. Phrased differently, an injury in contract would have fewer "substantial factors" than would the same injury in tort. With this in mind, the Court finds that Powersource's failure to provide a "company owned or leased aircraft" was not a substantial factor in the crash. Plaintiffs' expert has opined that the crash was caused by pilot error, and not any mechanical malfunction of the plane. [Record No. 95, pg. 17; Record No. 96, Ex. 24]

**B.     Kentucky Law Applies to Plaintiffs' Tort Claims against all Defendants**.

Although the plaintiffs' contract claim against Powersource is governed by Indiana law under the choice of law provision in his employment contract, the contract does not provide for

-14-

a choice of law to govern tort claims.  Thus, the Court must determine whether Indiana or Kentucky law should govern the plaintiffs' tort claims against Powersource.[3]

Lengthy analysis of this issue is not necessary because all parties argue that Kentucky law should apply to plaintiffs' tort claims against both Powersource and Phantom.  Having reviewed the parties' briefs, the Court agrees that Kentucky law should apply to those claims.  While Kentucky no longer strictly applies a *lex loci* rule, the "sufficiency of interests" test which has replaced it still favors applying Kentucky law when the case is to be tried in a Kentucky forum. *Wessling v. Paris*, 417 S.W.2d 259, 260-261 (Ky. 1967); *Arnett v. Thompson*, 433 S.W.2d 109 (Ky. 1968).

Generally, federal courts are to apply the law of the forum state in diversity actions. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 596 (1941).  Kentucky courts have determined that Kentucky law should be applied whenever there are "enough contacts to justify applying Kentucky law."[4]  *Adam v. J.B. Hunt Transp.*, 130 F.3d 219, 230 (6th Cir. 1997); *citing Arnett*, 433 S.W.2d 109.  This Court is also mindful that "Kentucky's conflict of law rules favor the application of its own law whenever it can be justified." *Johnson v. S.O.S. Transport, Inc.*, 926 F.2d 516, 519 n.6 (6th Cir. 1991).

Considering that the plaintiffs are residents of Kentucky, the plaintiffs were treated in Kentucky, the allegedly negligent operation of the aircraft occurred in Kentucky, and the

---

[3]     Because Phantom Leasing was not a party to the employment contract, the analysis of the applicable law to plaintiffs' claims against Phantom will be governed by the "interest analysis" of *Wessling v. Paris*, 417 S.W.2d 259, 260-261 (Ky. 1967).  *See* discussion *infra*.

[4]     Kentucky courts require only that the contacts be "significant", not that they be the "most significant."  *J.B. Hunt Transp.*, 130 F.3d at 231.

accident occurred in Kentucky, there are sufficient contacts to justify applying Kentucky law. (*See Arnett*, 433 S.W.2d at 113 ( the fact that the accident occurred in Kentucky was sufficient contacts to apply Kentucky law.))

### C.   Powersource and Phantom Leasing are not Joint Entities.

Plaintiffs allege that Powersource and Phantom are joint entities. [Record No. 84, pg. 6-9; Record No. 101, pg. 6-8]  While this allegation appears in plaintiffs' response to the motions for summary judgment filed by Phantom Leasing and Powersource, there is no such allegation contained in the plaintiffs' complaint.  In truth, the only argument plaintiffs' make to support this contention appears in their "material facts" section, apparently as a statement of fact. "Powersource and Phantom share employees, physical offices, responsibilities and actions in ways that are inextricably intertwined."  [Record No. 84, pg. 6; Record No. 101, pg. 6] However, as both defendants note, because allegations that one entity is the alter ego of another often requires piercing the corporate veil, these allegations must be plead in the complaint. *First Nat'l Bank v. Lustig*, 809 F. Supp. 444, 446 (D. La. 1992).

In *Lustig*, the United States District Court for the Eastern District of Louisiana applied Kentucky law and dismissed an action pursuant to Fed.R.Civ.Pro. 12(b)(6) where plaintiff failed to include in their complaint allegations that one defendant was the alter ego of the other.  *Id.* Like the plaintiff in *Lustig*, nowhere in the complaint do the Zetters' allege that either Powersource or Phantom were

> fraudulently or otherwise undercapitalized, [] fraudulently organized, that []
> ownership and control of [either Powersource or Phantom Leasing] has deprived
> [the Zetters] of a remedy, that separate treatment will promote a fraud or injustice,
> that [either Powersource's or Phantom Leasing's] officers and directors are

-16-

non-functioning, that [either defendant] does not maintain corporate formalities, or that [either defendant] siphons [] funds.

*Lustig*, 809 F. Supp. at 446; *citing White v. Winchester Land Dev., Inc.*, 584 S.W.2d 56, 60 (Ky. Ct. App. 1979) (*citing Poyner v. Lear Siegler, Inc.*, 542 F.2d 955, 958 (6th Cir. 1976), *cert. denied*, 430 U.S. 969 (1977)); *Big Four Mills, Ltd. v. Commercial Credit Co.*, 211 S.W.2d 831 (Ky. 1948).[5]

In *White v. Winchester Land Dev.*, *supra*, the Kentucky Court of Appeals determined that a plaintiff must establish two elements to prove one entity was the alter ego of another.

(1) that the corporation is not only influenced by the owners, but also that there is such unity of ownership and interest that their separateness has ceased; and (2) that the facts are such that an adherence to the normal attributes, viz, treatment as a separate entity, of separate corporate existence would sanction a fraud or promote injustice.

*Id.* at 60.

In this action, the plaintiffs have failed to establish either of these elements. They have referenced evidence which indicates that Bakos is the president of both companies, that Premil sometimes performed services for Phantom while an employee of Powersource, and that Phantom (which owned a Cessna) would sometimes pay fuel and pilot costs for Powersource employee flights. However, it appears undisputed that Powersource reimbursed Phantom for these flights. Moreover, as plaintiffs point out, Phantom and Powersource have different business functions. While Phantom is an equipment company which sells and leases tractor-

---

[5]    *See White v. Winchester Land Development Corp.*, 584 S.W.2d 60, 61 (Ky. App. 1979), for a complete discussion of the circumstances under which Kentucky courts will pierce the corporate veil to hold separate entities jointly liable by virtue of their organization, or under which they will extend that liability to shareholders.

trailes, Powersource is more akin to a trucking company which coordinates loads for owner-operators. This evidence, even taken in the light most favorable to plaintiffs, does not establish that the "separateness" of Powersource and Phantom has ceased. Likewise, there are no allegations or evidence that Powersource and Phantom exist as separate entities to allow them to avoid liability in these kinds of actions, such that treatment of the two as separate entities would "sanction a fraud or promote injustice." *White* at 60.

The Court is also mindful of Kentucky's rule that "the corporate veil should only be pierced 'reluctantly and cautiously'". *See White* at 62. Therefore, because there are no allegations in the second amended complaint that Powersource and Phantom are joint entities,[6] nor any reason given as to why these two entities should be treated as alter egos, the Court finds them to be separate entities for the purpose of this analysis.

### D. Plaintiffs' Tort Claims Against Powersource

To establish a claim for negligence, a plaintiff must show that: (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach caused the plaintiff's damages. *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992). In any action grounded in negligence, the "existence or non-existence of a duty on the part of the defendant . . . is entirely a question of law . . . and it must be determined only by the court." *Taylor v. Bridge Builders*, 720 F.2d 680 (6th Cir. 1983), citing W. Prosser, Law of Torts, § 37 (4th Ed. 1971).

---

6       Even if plaintiffs were allowed to amend their complaint to add allegations of alter-ego, it would not be supported by the evidence in the record. Accordingly, any such motion would not appear to be well-taken.

-18-

Here, while the issue of duty is a question of law, the alleged breach of that duty is a question of fact. Further, the issue of injury present a mixed question of law and fact. And finally, whether and to what extent the plaintiff suffered an injury is a fact determination, while causation presents a mixed question of law and fact. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88-89 (Ky. 2003), *citing Deutsch v. Shein*, 597 S.W.2d 141, 145 (Ky. 1980).

The plaintiffs have raised several different theories under which they argue Powersource acted negligently. However, as noted above, the existence or non-existence of a duty of care is for the Court to decide, and this issue is not dependent on the evidence identified in the motion for summary judgment. For the determination of breach of that duty, plaintiffs need only identify sufficient evidence such that a reasonable jury could find Powersource breached their duty of care. The Court need not address the last part of the negligence test at this time. Both sides agree that the plane crash was the cause of plaintiffs' injuries, and that if anyone was negligent in operating, maintaining, or leasing the aircraft or in choosing the pilot, that negligence would be a proximate cause of plaintiffs' damages.

### 1.      Negligent Operation

The plaintiffs have alleged that they were injured by Agarwal's negligent operation of the aircraft. On summary judgment, there is evidence to suggest that Agarwal's operation of the aircraft was negligent. *see* Plaintiffs' Expert Opinion [Record No. 95, Ex. 40]. Plaintiffs argue that this negligence should be imputed to Powersource under a theory of *respondeat superior*, because Agarwal was "an employee, express or apparent agent" of Powersource. [Record No. 101, pg. 2]. However, the plaintiffs have conceded that Agarwal was actually employed by Griffith Aviation. [Record No. 101, pg. 14] There is no dispute that Griffith Aviation would be

vicariously liable for the actions of Agarwal in flying the plane.  For purposes of this analysis, Griffith Aviation and Agarwal will be treated as one entity, since the negligence of the latter would be imputed to the former.  The question then is whether Griffith and Agarwal were "employees" of Powersource, or whether they should instead be considered independent contractors.  Alternatively, plaintiffs suggest that because Powersource's president described Agarwal as "our pilot", Agarwal was held out as an apparent agent of Powersource.

### a.  Griffith/Agarwal were independent contractors

Powersource argues that Griffith/Agarwal was an independent contractor – not an employee of Powersource – and that under Kentucky law no liability attaches for the negligence of independent contractors.  Powersource directs the Court to the Kentucky Supreme Court's decision in *Kentucky Unemployment Ins. Commission v. Landmark Community Newspapers*, 91 S.W.3d 575 (Ky. 2002).  In *Landmark*, the court adopts the Restatement (Second) of Agency, and identifies a number of factors which determine whether Griffith/Agarwal should be considered an independent contractor:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*Landmark* at 579.   The court also noted that "not one of the aforementioned factors is determinative."[7]  *Id.* at 580.  While the evidence underlying each factor is a question of fact, the ultimate determination as to whether an individual is an employee or independent contractor is a question of law.  *Id.*

In arguing that Griffith/Agarwal should be considered employees of Powersource, the plaintiffs do not address the individual factors which the Kentucky Supreme Court outlines in *Landmark*.  However, they do identify evidence that, on one occasion in which Todd Zetter rode with Bakos in a plane piloted by Agarwal, Bakos gave instructions as to the altitude at which the plane was to be flown, when re-fueling stops should be made, and how much fuel should be put

---

[7]     *Landmark* overruled a line of Kentucky cases which held that the right to control the details of the work was the most important factor (or chief criterion).  This determination effectively overrules the Sixth Circuit decision in *Grant v. Bill Walker Pontiac*, cited by plaintiffs, as the cases relied upon by the Sixth Circuit in that case were overruled by *Landmark*.  *Compare Grant v. Bill Walker Pontiac-GMC*, Inc., 523 F.2d 1301, 1305 (6th Cir. 1975) (Under "Kentucky law the right to control is considered to be the most critical element in determining whether an agency relationship exists") with *Landmark*, 91 S.W.3d at 579-580 ("ability to control the specific details of the work is an important factor for a court or administrative agency to consider.  However, we do not believe this factor is of greater importance than the others.")

in the plane.  [Record No. 101, pg. 14]  This evidence suggests that Bakos, as president of Powersource, exercised a fair degree of control over the details of the work (factor (a)).

However, all the other evidence regarding Agarwal's relationship to Powersource either supports a theory of apparent agency[8] or is evidence identified by Powersource to show that Griffith/Agarwal were independent contractors.  This includes the fact that Griffith was in a business unrelated to Powersource, controlled its own business operations, controlled its own licensing requirements, provided its own tools or obtained them from someone other than Powersource, and thought of itself as an independent contractor.  [Record No. 94, pg. 10-15]

Therefore, even taking all evidence identified by plaintiffs as true, Griffith/Agarwal must be considered independent contractors and not employees.  Kentucky follows the general rule that "an employer is not liable for the torts of an independent contractor in the performance of his job."  *Miles Farm Supply v. Ellis*, 878 S.W.2d 803, 804 (Ky. Ct. App. 1994).  Powersource cannot be vicariously liable to plaintiffs under the theory that Griffith/Agarwal were employees of Powersource.

### b.      Agarwal may have been an apparent agent.

A determination that Griffith/Agarwal were not employees does not, however, foreclose an inquiry into whether Powersource held Agarwal out as an employee, thereby creating an issue of apparent agency.  Kentucky has also adopted the Restatement (Second) of Agency as it relates to apparent agency, in §267.  *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255, 257 (Ky. 1985).  Under this Restatement section:

---

8       For example, Bakos told Todd Zetter that Agarwal was "our pilot" and that he, Todd Zetter, could direct the details of trips mid-flight.  [Record No. 101 at 14-15]

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Restatement 2d of Agency, § 267.  For Powersource to be liable under the theory that Agarwal was an apparent agent, plaintiffs would have to show that: (1) Powersource represented that Agarwal was its agent, and (2) that plaintiffs justifiably relied on Agarwal's skill because they believed he worked for Powersource.

The first element requires evidence that Agarwal was represented to be an agent/employee of Powersource by someone with authority at Powersource.  Plaintiffs have identified several statements made by Bakos in his capacity as Powersource's president which, if the jury found them believable, could constitute apparent agency.  [Record No. 101, pg.14] This includes a statement by Bakos to Todd Zetter that Agarwal was Powersource's pilot, that Agarwal worked for Powersource, and that Todd Zetter, as a Powersource vice-president, had the authority to control flight details when Agarwal was piloting.  *Id.*

However, a finding that a third-party could believe that Agarwal was an apparent agent of Powersource would be insufficient to establish liability.  The first comment to §267 provides:

> The mere fact that acts are done by one whom the injured party believes to be the defendant's servant is not sufficient to cause the apparent master to be liable. There must be such reliance upon the manifestation as exposes the plaintiff to the negligent conduct. The rule normally applies where the plaintiff has submitted himself to the care or protection of an apparent servant in response to an invitation from the defendant to enter into such relations with such servant. A manifestation of authority constitutes an invitation to deal with such servant and to enter into relations with him which are consistent with the apparent authority.

Restatement 2d of Agency, § 267.  In short, a jury would also have to find the alleged reliance to be "justifiable".  In this context, this would involve an analysis of reasonableness.  That is,

-23-

was it reasonable for Todd Zetter to rely on Bakos' statements to form the belief that Agarwal worked for Powersource?  Powersource argues that belief was unreasonable, given all the evidence which indicates Todd Zetter, in his capacity as a Powersource vice-president, should have known that Agarwal was not on the payroll.  [Record No. 107, pg. 7-8]

A jury would also have to find that there was "such reliance upon the [holding out of Agarwal as a Powersource employee] as [to] expose the plaintiff to the negligent conduct." Restat. 2d of Agency, § 267.  The court in *Sims v. Marriott Int'l, Inc.,* 184 F. Supp. 2d 616, 617 (W.D. Ky. 2001), paraphrased this rule to require plaintiffs to show that they acted in reliance of that representation.  That is, assuming the jury finds the plaintiffs' belief in Agarwal's employment status reasonable, they would also have to find that it was the *plaintiffs'* reliance on that representation that exposed them to harm.  Plaintiffs would have to show that, had they known Agarwal worked for Griffith – not Powersource – they would have undertaken some kind of independent investigation into his credentials.

Although it seems unlikely that a jury would find such representations to be credible, the Court cannot say that no reasonable jury could find the plaintiffs' belief in, and reliance on, Bakos' representations reasonable.  Accordingly, summary judgment on the claim of negligent operation against Powersource will be denied.

## 2.    Negligent Entrustment

Next, plaintiffs allege that Powersource is liable for negligent entrustment because they "permit[ted Agarwal] to operate an aircraft without proper FAA licensing and fail[ed] to verify the pilot's currency with FAA regulations."  [Record No. 101, pg. 23]  Powersource responds that Kentucky does not recognize an action for "negligent entrustment of aircraft".  [Record No.

107, pg. 8]  Alternatively, Powersource argues that plaintiffs cannot establish the elements of ordinary negligent entrustment because Powersource did not own the aircraft which crashed. *Id.*

Plaintiffs argue that this Court should follow the holding of *Anderson Aviation v. Perez*, 508 P.2d 87 (Ariz. App. 1973), to define the elements of the more specific tort of negligent entrustment of an aircraft, rather than using the more general tort of negligent entrustment which Kentucky courts have actually adopted.  *Anderson*, 508 P.2d 87; but see *Hercules Powder Co. v. Hicks*, 453 S.W.2d 583 (Ky. 1970).   And while the Court has not located a Kentucky case which adopts the tort of "negligent enturstment of aircraft", the plaintiffs have also failed to make any argument, or cite any Kentucky case, which suggests that Kentucky courts might adopt such an action.

Under *Erie*, this Court is bound to apply substantive state law as would a state trial court. 304 U.S. 64 (1938).  When state law is unsettled or undecided, the Court must attempt to predict how the state's highest court would rule if confronted with the issue.  *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465 (1967); *Mills v. GAF Corp.*, 20 F.3d 678, 681 (1994)("[w]here the state supreme court has not spoken, our task is to discern how that court would respond if confronted with the issue").  Federal courts generally follow a policy against expanding state law.  "Federal courts hearing diversity matters should be extremely cautious about adopting 'substantive innovation' in state law." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 578 (6th Cir. 2004).  A federal court's role is to apply state law as it exists, not to surmise or suggest its expansion. *Burris Chemical, Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993).  Accordingly, the undersigned declines to extend Kentucky law by finding an action for

-25-

"negligent entrustment of aircraft" as some other jurisdictions recognize. Plaintiffs' claim will instead be analyzed under the more general tort of negligent entrustment.

In defining the elements of an action for negligent entrustment, Kentucky courts have adopted the Restatement (Second) of Torts § 390, which provides that:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

*Mishler v. Coleman*, 1994 U.S. App. LEXIS 14945, 1-2 (6th Cir. 1994) (unpublished). The Kentucky Supreme Court has applied this as requiring proof that "the supplier of a chattel for use by an incompetent person [is liable] if, and only if, the supplier knows or has reason to know of the probable misuse by reason of the incompetence of the person to whom the chattel is furnished." *Hercules Powder*, 453 S.W.2d at 587. Therefore, to defeat summary judgment on the claim of negligent entrustment, the plaintiffs must demonstrate a genuine dispute concerning whether: (1) Powersource was the "supplier of" the aircraft, (2) Agarwal was a "incompetent person", and (3) Powersource "knew or had reason to know" that Agarwal was likely to misuse the aircraft by reason of his incompetence.

Plaintiffs have identified sufficient evidence to create a genuine issue of fact regarding the second element (i.e., that Agarwal was an "incompetent person"). Although evidence that Agarwal let his second class medical certificate lapse may not be sufficient to ultimately convince a jury, the Court cannot say that a reasonable jury could not find him "incompetent" to pilot the aircraft on the day in question. However, summary judgment on the claim of

-26-

negligent entrustment is warranted because plaintiffs have not identified sufficient evidence by which a reasonable jury could find that Powersource "supplied" the plane. Having granted summary judgment on the negligent entrustment claim on this basis, the Court reaches no decision on whether Powersource had a "reason to know" (i.e., duty to investigate) about Agarwal's second class medical license.[9]

As Powersource notes, there is no evidence in the record that it "supplied" the plane. [Record No. 107, pg. 8-12]  And while nowhere is it explicitly stated, in either §390 or any of the cases interpreting it, that the party supplying the chattel must have ownership, possession or control of the same, all of the comments and illustrations to the Restatement assume as much. Indeed, the comments state that the rule applies to "sellers, lessors, donors or lenders, and to all kinds of bailors".  Restatement 2d of Torts, § 390.  The negative implication is that the rule would not apply to lessees or bailees. *Mullins v. Burgin*, 1989 Ky. App. LEXIS 135 (Ky. App. 1989).

Additionally, in a similar case involving the operation of a motor boat, the Sixth Circuit's analysis of negligent entrustment under the Restatement does not address the issue of "supply" because the person who supplied the boat was its owner. *Barker v. Dornfeld*, 1990 U.S. App. LEXIS 22462 (6th Cir. 1990) (unpublished).  However, *Barker* does not stand for the proposition

---

9       However, at least three judges then on the Kentucky Supreme Court supported the common law rule that "the mere entrustment of a vehicle to an unlicensed driver does not render the owner liable for the driver's negligence absent proof that the driver was incompetent and the owner had knowledge of that fact." *McGrew v. Stone*, 998 S.W.2d 5, 9 (Ky. 1999)(Cooper, Graves, Keller, JJ., dissenting).  This would suggest that under the common law of negligent entrustment in Kentucky, the fact that the operator did not have a license would not, by itself, be sufficient to establish liability.  Neither would the owner have a duty to investigate, since the language in *McGrew* apparently requires that only actual knowledge will convey liability on the owner of the vehicle.

that a party must own the chattel to "supply" it under the Restatement.  As the illustrations to the Restatement demonstrate, a party could be liable if, in returning the property of another it entrusted (i.e., supplied) that property to someone who was incompetent, legally or otherwise.

No authority has been cited in which a party was held liable under negligent entrustment where it had no control at any time of the object (i.e., chattel) which was misused.  Powersource cannot be liable for negligently entrusting Agarwal with a plane which was owned by Great Northern[10] and kept at Griffith Airport.[11]  The plaintiffs have identified no evidence to suggest that Powersource exercised any physical possession or control of the Great Northern Cessna which was involved in the crash.

### 3.     Negligent Maintenance

Plaintiffs have also alleged that the airplane crash was due to the negligent maintenance by defendants or their agents.  [Record No. 40, ¶ 13, 24, 26, 28, 30]  However, plaintiffs make no arguments in their responses that Powersource was responsible for the maintenance of the Great Northern Cessna.  Further, there is no evidence that Powersource had any ownership of, nor control over, the Great Northern Cessna which was involved in the crash.  Accordingly, the Court will grant summary judgment on the claim of negligent maintenance.

### 4.     Negligent Leasing

---

[10]     The fact was alleged by plaintiffs in their Second Amended Complaint [Record No. 40, ¶3] and confirmed by the airplane's registration in Great Northern's name.  [Record No. 95, Ex. 19]

[11]     The fact that the airplane appeared to be in physical possession of Griffith might allow the claim of negligent entrustment to lie against Griffith, even though Griffith is not the owner of record.

-28-

Plaintiffs' final cause of action against Powersource asserts that Powersource "negligently leased" the Great Northern Cessna.  [Record No. 40, ¶13]  Powersource responds that Kentucky does not recognize any action for negligent leasing and the even if it did, Powersource did not lease the aircraft.  Because the Court can find no cause of action for negligent leasing (and, therefore, no corresponding legal duty), it need determine whether Powersource actually leased the aircraft in question.

Plaintiffs argue that there is a jury question regarding whether Powersource chartered or leased the flight in question.  However, despite Powersource's argument that Kentucky does not recognize a cause of action for negligent leasing, the plaintiffs' response identifies no cases in which a Kentucky court defines the elements of such an action.  Indeed, the Court is aware of only one case in which a Kentucky Court has even used the phrase: *Burke Enterprises, Inc. v. Mitchell*, 700 S.W.2d 789, 790 (Ky. 1985).

*Burke* was a products liability action in which the plaintiff Mitchell rented a post-hole digger from Burke Enterprises.  Burke was in the equipment rental business.  Mitchell was injured when he placed his hand in the engine before it restarted, losing part of his thumb.  Mitchell received no instructions regarding the machine's use, even though Burke employees were supposed to instruct new operators in the post-hole digger's use.  *Id.*  The Kentucky Supreme Court ultimately found Burke guilty of simple negligence as the renter of the equipment, holding that Burke was "liable as a commercial renter for its negligence based on what its employees did or did not do, and not otherwise."  *Id.* at 792.

There is no suggestion in the present case that Powersource was the commercial renter of the Great Northern Cessna.  To the extent that a cause of action existed for negligent leasing,

-29-

at best such a cause of action would lie against Great Northern, or possibly Griffith, depending upon who had responsibility for the plane's upkeep.  It is more likely that any elements of a cause of action for negligent leasing are subsumed into plaintiffs' other causes of action, including negligent entrustment and negligent maintenance.

Even if the Court were inclined to recognize a cause of action for negligent leasing, under *Combs v. Int'l Ins. Co.,* 354 F.3d at 578, the Court recognizes that this would represent a substantive innovation of state law.  At this time, no such cause of action exists under Kentucky law, largely because the elements that plaintiffs urge on the Court are already covered under other, recognized causes of action.  As a result, summary judgment is appropriate regarding the claim of negligent leasing.

### E.    Plaintiffs' Tort Claims Against Phantom Leasing

The plaintiffs argue that Phantom and Powersource were joint entities.  This would appear to be why plaintiffs have made nearly identical claims against Phantom as they made against Powersource.  However, the Court has determined that plaintiffs failed to properly plead alter ego status, or demonstrate any reason why the Court should pierce the corporate veil.  As such, the claims against Phantom should receive individual treatment, as did the claims against Powersource.

However, because many of plaintiffs' allegations were legally defective, much of the analysis is the same.  Indeed, the plaintiffs' Complaint alleges that Phantom was even less involved in the details of the flight than was Powersource.  Phantom's only involvement appears to have been that it would initially pay for the costs of the flight, to be later reimbursed by Powersource.  [Record No. 90, pg. 6]  Indeed, the only fact which would make Phantom more

-30-

culpable than Powersource is that Phantom carried Agarwal as a pilot on the insurance for the Cessna it owned, a fact that the plaintiffs have not alleged was known by the Zetters' prior to the accident. *Id.* at 10.

For these reasons, the Court will grant summary judgment on the negligent leasing and negligent maintenance claims against Phantom, utilizing the same rationale outlined above.[12] Kentucky does not recognize a cause of action for negligent leasing, nor are there any allegations that Phantom had any responsibility for maintenance of the Great Northern Cessna. However, because of Phantom's different role in obtaining the plane and pilot, and prior practice of bearing the initial costs of these flights, separate analysis is required for the claims of negligent operation and negligent entrustment.

### 1.    Negligent Operation

Unlike plaintiffs' claims against Powersource, it would appear that a claim of vicarious liability for negligent operation by Agarwal can only succeed against Phantom if Agarwal was actually an agent or employee, and not an independent contractor. While the plaintiffs identified evidence which could indicate that Agarwal had been held out to the Zetters as an employee of Powersource based on the comments made by Bakos, there is no such evidence that he or anyone else made such comments in relation to Phantom. Indeed, the only evidence of affiliation between Phantom and Agarwal, besides the fact that Phantom paid the bills for his flight time, is that Agarwal was listed on the insurance policy for Phantom's Cessna. [Record No. 90, pg. 10]. However, this cannot establish or support a claim for apparent agency because there is no

---

12      See discussion *supra*, (D)(3) and (D)(4).

allegations that Todd Zetter was aware of this fact prior to discovery in this case. Plaintiffs allege that Premil, in listing Agarwal as a pilot of the Phantom Cessna, had a duty to investigate his license qualifications. *Id.* at 9. While this will affect the analysis of whether Phantom should have known of Agarwal's alleged "incompetence" to fly the airplane under a theory of negligent entrustment, it is not evidence that Agarwal was being "held out" to the Zetters as a Phantom pilot. If anything, the evidence that Bakos led plaintiffs to believe that Agarwal was Powersource's pilot makes it less reasonable for them to believe he was also Phantom's pilot. Moreover, it makes it less likely that any reliance upon his alleged Phantom employment would have affected their behavior in any way above and beyond their belief is his status as a Powersource employee.

As there is no evidence to suggest that Agarwal was an apparent agent of Phantom, the only issue left in the claim for negligent operation is whether Agarwal was an actual agent/employee of Phantom, or was instead an independent contractor as Phantom argues. With respect to this issue, the evidence more strongly indicates that Agarwal and Griffith were independent contractors of Phantom. Plaintiffs seem to concede this point as, unlike their response to Powersource motion for summary judgment, they make no argument that Agarwal was employed by Phantom Leasing. In fact, the only place the plaintiffs even mention Phantom in connection with Agarwal's possible agency is their reference to Powersource/Phantom[13] as though they were a single entity, a contention the Court has already rejected. Thus, summary judgment on plaintiffs' negligent operation claim against Phantom is appropriate.

---

13     *See, e.g.,* [Record No. 90, pg. 20-21] ("the assertion that Powersource/Phantom instructed . . ." and "the degree to which Powersource/Phantom exercised control . . .")

-32-

### 2.    Negligent Entrustment

Summary judgment is also appropriate on the allegation of negligent entrustment, for the same reasons outlined above.  While plaintiffs have identified evidence which suggests that Phantom  owned a Cessna, they concede that the Phantom Cessna was not the plane involved in the crash. [Record No. 40, ¶3]  Therefore, for the reasons listed above, as Phantom did not "supply" the plane, they cannot be liable for negligent entrustment.  The additional evidence which the plaintiffs identify (i.e., that Agarwal was listed on one of Phantom's insurance policies) would probably lend support to the argument that Phantom had a "reason to know" that Agarwal was legally incompetent to pilot the plane.  But as Phantom could not "supply" the plane, the Court does not reach the issue of "reason to know".

### IV.    CONCLUSION

The plane crash which injured the Zetters was indeed a tragedy, and the Zetters have viable claims against Griffith Aviation, Great Northern Aircraft, and Shalabh Agarwal for negligent operation and negligent entrustment.  These claims have now been settled as the pleadings and the parties' representations confirm.  However, with the exception of an apparent agency claim under a negligent operation theory against Powersource, their remaining claims cannot survive summary judgment,.  Accordingly, for the reasons discussed herein, it is

**ORDERED** as follows:

(1)    Phantom Leasing's motion for summary judgment [Record No. 77] is **GRANTED**.

(2)    Powersource Transportation's motion for summary judgment regarding the plaintiffs' contract claims [Record No. 93] is **GRANTED**.

-33-

(3)     Powersource Transportation's motion for summary judgment regarding the plaintiffs' tort claims [Record No. 94] is **GRANTED**, in part, and **DENIED**, in part.

(4)     Powersource Transportation's motion for leave to file an Amended Answer [Record No. 117] is **GRANTED**.  The Clerk of the Court is directed to file the tendered Amended Answer attached as Exhibit 1 to its motion.

This 25th day of April, 2006.

Signed By:

*__Danny C. Reeves__* DCR

**United States District Judge**

-34-