UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | | |
|---|---|---|
| TODD ZETTER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 6: 03-218-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| GRIFFITH AVIATION, INC., et al, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Powersource's motion for summary judgment regarding the Plaintiffs' remaining agency claim [Record No. 124] and Phantom Leasing's motion for judgment. [Record No. 127]  Because there are no material factual issues in dispute regarding the agency claim, the Court will grant Powersource's motion for summary judgment. Similarly, because summary judgment on all claims has been previously granted to Phantom Leasing, their motion for judgment also will be granted.

**I.     BACKGROUND**

This case arises from an airplane crash in Somerset, Kentucky, on February 16, 2003. Plaintiff Mia Zetter and her four children were returning home after visiting Mia's husband and the children's father, Todd Zetter, in Griffith, Indiana. Mia and the children were traveling in a Cessna 421 which was owned by Great Northern Aircraft (the "Great Northern Cessna") and piloted by Shalabh Agarwal.  The plane crashed as it was making its final approach into the Somerset airport.

The pilot, Agarwal, and another passenger in the front seat (Joseph Maglish) were killed in the crash. In addition, one of the Zetter children, R.Z., was ejected from the aircraft and died. Mia Zetter and the other three Zetter children, M.Z., C.Z. and Z.Z., were injured in the crash.

At the time of the crash, Todd Zetter was a vice president of Powersource, having been hired in that capacity in October 2002. At the time of the accident, he was second in the Powersource corporate hierarchy, ranking only behind Alfred Bakos, president of Powersource. Bakos was also president of Phantom Leasing.

Powersource is an Indiana corporation that provides services and coordination in the trucking industry. Phantom Leasing is an Indiana corporation that buys and leases semi-tractors to drivers who wish to become owner-operators. Most of these owner-operators then contract with Powersource to obtain loads for delivery. Griffith Aviation is the fixed-base operator at Griffith Airport, which is located in Griffith, Indiana.

To entice Todd Zetter to agree to work in Griffith while his family remained behind in Somerset, a "Temporary Travel Arrangements" clause was included in his employment contract. This provided that Todd Zetter could fly home on weekends or the rest of the Zetter family could fly to Griffith. In either circumstance, Todd Zetter would speak with Lisa Premil, an administrative assistant for Powersource, to make the arrangements. Mr. Zetter would give her the dates of the flights, and Premil would then arrange the details of the trip.

Premil would get approval for the trip from Bakos, and would then contact Griffith Aviation. Normally, Griffith would provide the pilot, and the Zetters would fly on a Bonanza airplane owned by Bakos, or on a Cessna 421 owned by Phantom Leasing. Despite the fact that

Todd Zetter worked for Powersource, Phantom Leasing would normally receive an invoice for the pilot time and fuel, which it would pay, settling up with Powersource later.

On the weekend of the accident, Paul Goldsmith, a Griffith pilot, picked up Mia Zetter and her children in Somerset on February 11, 2003, and delivered them safely to Griffith, Indiana. Prior to the return flight on February 16, 2003, Todd Zetter brought his wife and children to Griffith Airport for the return trip, arriving at approximately 5:00 p.m. Todd Zetter then assisted the pilot, Agarwal, in loading the family's baggage into the Great Northern Cessna. The flight departed at 5:30 p.m., and crashed on final approach to Somerset at 8:02 p.m.[1]

## II.     LEGAL STANDARD

As the Court has noted previously, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Once a moving party has met its burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Keeneland Ass'n, Inc. v. Earnes*, 830 F.Supp. 974, 984 (E.D.Ky. 1993), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415 (6th Cir. 2002).

---

[1]     For the complete designation of the evidence in the case to this point, *see* [Record Nos. 95, 96, 99, 101]

Once the movant has satisfied this burden, the non-movant must go beyond the assertions made in the pleadings and come forward with specific evidence to demonstrate that there is a genuine issue of material fact. *Id.* The nonmoving party cannot rely upon the assertions in its pleadings; rather, that party must come forward with probative evidence, such as sworn affidavits to support its claims. *Celotex*, at 324. However, the trial court does not have a duty to search the entire record to establish that it is bereft of any genuine issue of material fact. *In re Morris*, 260 F.3d 654 (6th Cir. 2002). Rather, the nonmoving party has an affirmative obligation to direct the court's attention to those specific portions of the record upon which it seeks to rely to create genuine issues of material fact. *Id.*

Upon review of all the evidence relevant to the motion for summary judgment, a district court should, after viewing the evidence in a light most favorable to the nonmoving party, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993); *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991), *cert. denied*, 117 L. Ed. 2d 624, 112 S. Ct. 1481 (1992). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. "The inquiry performed is the threshold inquiry of determining whether there is the need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250; *Stein v. National City*

*Bank*, 942 F.2d 1062, 1064 (6th Cir. 1991). In making this determination, the Court must review all the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

**III.   ANALYSIS**

This case was filed on April 29, 2003, approximately two and one-half months after the plane crash. Following a lengthy period of discovery and the filing of motions for summary judgment by Defendants Powersource and Phantom Leasing, the Plaintiffs reached a settlement with Defendants Griffith Aviation, Great Northern Aircraft, Paul Goldsmith, and the Estate of Shalabh Agarwal. In exchange for payment of $500,000.00, the Plaintiffs released these Defendants from "any and all claims of plaintiffs, whether asserted or unasserted." [Record No. 88]

The terms of the settlement are contained in documents labeled "Release of All Claims." [Record No. 121, Ex. 1] Through this release, each Plaintiff agreed to:

> release, acquit and forever discharge, release and covenant not to sue . . . [defendants Griffith Aviation, Great Northern Aircraft, Paul Goldsmith, and the Estate of Shalabh Agarwal] . . . for, of and from any and all past, present, and future actions, causes of action, claims, demands, damages, costs, loss of services, expenses, compensation, third party actions, suits at law or equity, including but not limited to. . .(2) claims or suits for contribution or indemnity of whatever nature. . . including but not limited to the claims . . . made in [the case at bar].

[Record No. 121, Ex. 1]. As a result of this settlement, the Plaintiffs moved to dismiss all claims against these Defendants. This left pending only the claims against defendants Powersource and Phantom Leasing.

These remaining claims included a breach of contract claim against Powersource and claims of negligent operation, negligent maintenance, negligent entrustment and negligent leasing against both Defendants. In addition, Plaintiffs also alleged that Powersource and Phantom Leasing were joint entities. The Court heard arguments of counsel on April 24, 2005, and issued an opinion the following day, granting the Defendants' motions for summary judgment on all claims except the claim of negligent operation against Powersource. [Record No. 119]

With respect to the claim of negligent operation, the Court found that certain statements allegedly made by Powersource's president could allow a jury to find that Powersource "held out" Agarwal to be an agent of the company, even though he was in fact an employee of Griffith Aviation, an independent contractor. These statements could allow a jury to find Powersource vicariously liable on a theory of apparent agency. *Id*. at 19-24.

As a result of the Court's prior opinion, Powersource filed a second motion for summary judgment, raising a legal theory not argued in its initial motion. [Record No. 125] Through the most recent motion, Powersource contends that the Plaintiffs, having executed a general release of Shalabh Agarwal estate for liability, are now prohibited from continuing their suit against Powersource under a theory of vicarious liability. *Id.* at 4. In support, Powersource contends that Kentucky follows a general principle of agency that "the release of an agent from liability also releases the principal." *Id.* at 4, *citing Waddle v. Galen*, 131 S.W.3d 361, 365 (Ky. App. 2004); *Copeland v. Humana of Kentucky, Inc.*, 769 S.W.2d 67, 69-70 (Ky. App. 1989).

In response, the Plaintiffs argue that summary judgment is inappropriate because there are facts in dispute regarding Powersource's role in selecting Agarwal as the pilot and Powersource's choice of aircraft. [Record No. 129, pg. 2-3] The Plaintiffs also argue that *Waddle* and *Copeland* are distinguishable, as Powersource has independent liability to Plaintiffs in addition to vicarious liability for the actions of Agarwal. *Id*. at 5.

The Plaintiffs and Powersource appear to disagree not only on the controlling law, but also concerning what claims remain following this Court's April 25, 2006, Memorandum Opinion and Order. Therefore, it is necessary to address whether Plaintiffs have any remaining claims for liability against Powersource, apart from vicarious liability for the actions of Agarwal.

### A. Vicarious Liability for the Acts of Agarwal as an Apparent Agent of Powersource Is the Only Remaining Claim

The Plaintiffs assert that, in addition to a theory of vicarious liability, Powersource could still be found liable for its role in the "selection [of] Mr. Agarwal as the pilot for the Zetter family, [for the] choice of an aircraft to fly the family and [for] Powersource's control over the selection of the aircraft." [Record No. 129, pg. 2] They claim that a jury could find Powersource negligent for "allowing Mr. Agarwal to fly without a valid FAA license or medical certificate" and for not checking "to see if Mr. Agarwal had a valid pilot's license or medical certificate." *Id.* at 3. Thus, the Plaintiffs must be arguing that these allegations provide independent bases for liability, were part of the "negligent operation" claim – the only claim on which the Court did not grant summary judgment for the defendants.

In their Second Amended Complaint, the Plaintiffs alleged that their injuries were the result of a crash caused by the "negligent entrustment, operation, leasing and/or maintenance by

defendants and/or their agents[.]" [Record No. 40] They later clarified their allegations in response to Powersource's first motion for summary judgment. [Record No. 101] There, they argued that Powersource was liable for negligent entrustment because it "permitted Mr. Agarwal to pilot Plaintiffs in violation of FAA regulations . . . where Powersource knew, or should have known, that Mr. Agarwal was not a duly licensed or certified pilot." *Id*. at 2. By contrast, the claim for negligent operation arose from Agarwal's negligent flying. This distinction is important because, to the extent Powersource is liable for the negligent flying/control of the airplane, that liability can arise only vicariously through the actions of an agent or employee. *Caretenders, Inc. v. Commonwealth*, 821 S.W.2d 83, 86 (Ky. 1991) ("It is true that a corporation can only act through its agents.")[2]

In the April 25, 2006, Memorandum Opinion and Order, the Court specifically addressed and resolved Plaintiffs claims of negligent entrustment. [Record No. 119, pp. 24-28] The Court rejected the Plaintiffs' specific claim of "negligent entrustment of an aircraft," finding no such cause of action under Kentucky law. The Court also rejected the Plaintiffs' more general claim of negligent entrustment. *Id*. However, the Plaintiffs now attempt to characterize Powersource's "negligence in choosing its agent and in supervising the agent" as the basis for independent liability. [Record No. 129, pg. 4] To the extent that this allegation of negligence concerns Powersource's failure to check Agarwal's license and/or medical certificate, it was addressed in the Court's prior opinion which granted summary judgment to Powersource on the claim of

---

[2] The Plaintiffs also appear to allege a breach of duty which arises from the contractual relationship between the parties. [See Record No. 129, pg. 5.] As the Court granted summary judgment for Defendants on all of the Plaintiffs' contract claims, no further analysis is necessary. [See Record No. 119, pgs. 5-14.]

negligent entrustment. And to the extent that this is a new claim for negligent supervision of an agent which was not pled in Plaintiffs' second amended complaint, it may not be pled for the first time in response to a motion for summary judgment. *Tucker v. Union of Needletrades*, 407 F.3d 784, 788 (6th Cir. 2005).[3]

Based on the foregoing analysis, the only claim remaining in this lawsuit is Plaintiffs' allegation of negligent operation; that is, whether Agarwal was negligent in his operation of the airplane. This alleged negligence extends to Powersource only if there is some evidence by which a jury could find Agarwal to be an apparent agent of Powersource. To the extent that Powersource would be liable to Plaintiffs, it can only be under a theory of vicarious liability.

> **B. The Plaintiffs Have Effectively Released Powersource of All Liability as a Result of the Execution of the "Release of All Claims" with Agarwal.**

Summary judgment is most appropriate where the only claims in a case present legal, rather than factual, questions. Having determined that the only remaining claim under which Plaintiffs may recover is based on a theory of vicarious liability, the Court can readily address Powersource's argument that such a claim was legally barred once Plaintiffs released Agarwal from liability. The Plaintiffs argue that material facts in dispute make summary judgment inappropriate. However, the legal question which Powersource's motion for summary judgment presents is exactly the kind of claim for which summary judgment is intended to address. *Stein*,

---

[3] As Powersource correctly notes, even if new allegations of negligence were permitted on summary judgment, the Plaintiffs' complaint (and response) are void of allegations that Powersource knew or should have known that Agarwal would act as he did. *Booker v. GTE.net, LLC*, 214 F. Supp. 2d 746, 751 (E.D.Ky. 2002); *aff'd* 350 F.3d 515 (6th Cir. 2003). The Plaintiffs have not alleged or offered proof concerning a link between Agarwal's lack of a medical certificate and his negligence in operating the aircraft.

942 F.2d at 1064. Powersource's motion for summary judgment is based upon the language of a release which Plaintiffs signed with other Defendants. Powersource argues that the language releasing Agarwal from liability, as well as the language of indemnity therein, operates to release Powersource from all liability which could result from the remaining claim of negligent operation. In short, the interpretation of the legal effect of unambiguous contract language is precisely the kind of determination for which summary judgment is appropriate. *Frear v. P.T.A. Indus.*, 103 S.W.3d 99 (Ky. 2003).

### 1. The Release of an Agent Also Releases the Principal of All Vicarious Liability.

Powersource argues that, under long standing principles of Kentucky law, the release of an agent from liability also releases the principal. [Record No. 125, pg. 4]; *citing Waddle*, 131 S.W.2d at 365; *Copeland*, 769 S.W.2d at 69-70. Therefore, when the Plaintiffs released Agarwal from liability for his alleged negligence in causing Plaintiffs' injuries, that release had the legal effect of releasing Powersource. In response, the Plaintiffs assert that *Waddle* and *Copeland* are distinguishable, and that the Court should instead apply the holding in *DeStock #14, Inc. v. Alvey*, 993 S.W.2d 952 (Ky. 1999).

In *Waddle*, the plaintiff was brought into the emergency room at Humana Hospital Lake Cumberland (Cumberland) following a motorcycle crash. He was initially attended by an emergency room doctor who called in Dr. Brown for a surgical consultation. Dr. Brown decided to transfer the plaintiff from the local hospital to the larger University of Kentucky Medical Center ("UKMC"), where the surgery was performed. Waddle and his mother sued Dr. Brown and Cumberland alleging that the delay between his diagnosis and the surgery (much of which

was due to the decision to transfer him to UKMC) was the result of Dr. Brown's negligence. Following a directed verdict for the defendants which was reversed on appeal and remanded for trial, the plaintiffs voluntarily dismissed their claim against Dr. Brown as the result of a settlement, although they apparently did not reduce it to writing. *Id*. at 363. Cumberland then moved for dismissal, arguing that once the plaintiffs had "released" the doctor from liability, they could no longer proceed against the hospital under an ostensible agency theory.[4]

Citing its prior holding in *Copeland*, the Kentucky Court of Appeals reaffirmed the basic principle that:

> [A] release of an agent from liability also releases the principal insofar as the principal's liability is derived solely from the agent's negligence.

*Id.* at 365. The plaintiffs in *Copeland* and *Waddle* had a cause of action against the hospital only because they had a cause of action against the hospital's employee. That is, the liability of the hospital was derivative of the employee's liability; if the employee were found not to be negligent, there could be no negligence on the part of the hospital.

This is the situation in the case at bar. Although the Plaintiffs alleged a number of theories of negligence, the Court granted Defendants summary judgment on all counts except one: that Agarwal was an apparent agent of Powersource, and his liability, therefore, could be imputed vicariously to Powersource as his principal.

Unfortunately for the Plaintiffs, there can be no question that the document entitled "Release of all claims" has the (intended) effect of discharging Agarwal from all liability arising

---

4   Kentucky courts use the terms "ostensible agency" and "apparent agency" interchangeably, as they do with "vicarious liability", "ostensible agency liability" and *respondeat superior*.

out of this incident.

> A release is a private agreement amongst parties which gives up or abandons a claim or right to the person against whom the claim exists or the right is to be enforced or exercised.

*Id.* at 364; *citing Frear*, 103 S.W.3d at 107.

The *Waddle* court found an oral release of the agent for consideration was sufficient to trigger the release of the principal. The comprehensive written release is similarly effective in the present case. Therefore, the release which the Plaintiffs executed to discharge Agarwal of all liability for their injuries also releases Powersource as his apparent principal.

The Court is aware of those few cases in which the release of the servant from liability did not release the master, even where the master's liability was only based on a theory of vicarious liability. However, as those courts have noted, those situations are few and far between, and are usually based on specific statutory schemes. *See, e.g., Munson v. United States*, 380 F.2d 976 (1967)[5]; *Combs v. United States of America*, 768 F. Supp. 584 (1991).[6] None of these cases affect the outcome in the present case.

Similarly, there are situations in which the injured party will be allowed to proceed against the master/principal even though they could no longer seek recovery against the servant/agent. For example, in *Cohen v. Alliant Enterprises, Inc.*, 60 S.W.3d 536 (Ky. 2001),

---

[5] The general rule that a "settlement with and release of the servant will exonerate the master" is not implicated where, under the Federal Tort Claims Act, the United States is not entitled to indemnity from employees acting in the scope of their duty.

[6] Where a plaintiff's exclusive remedy under the Federal Tort Claims Act is against the United States for an injury sustained by the negligence of an employee acting in the scope of employment, a separate settlement with that employee individually has no effect on the government's liability.

the plaintiff was allowed to proceed against a defendant hospital under the theory of *respondeat superior* even though a suit against the doctor/agent was prohibited by the statute of limitations. The Kentucky Supreme Court determined that there was a difference between the preclusion of recovery from the agent and the release of the agent from liability. *Id.* at 538. However, as in *DeStock*, the court implicitly affirmed the holding of *Copeland*, citing favorably its language:

> Having agreed not to sue the servant/agent, and made recovery by settlement therefrom, the appellant may not now seek additional recovery from the master/principal based upon the same acts of alleged negligence, whether the document is called a 'release' or 'covenant not to sue'.

*Id.*, *citing Copeland*, 769 S.W.2d at 69.

Finally, it is true that "a plaintiff may bring suit and recover from the principal under a vicarious liability theory without first filing suit and getting a judgment against the agent." *Cohen*, 60 S.W.3d at 539. However, this rule applies in situations where the plaintiff proceeds against the principal and agent separately, or against the principal alone. *Id.* Where the plaintiff has released the agent from liability, this rule is inapposite.

In this case, there are no circumstances suggesting that the general rule in *Copeland* and *Waddle* should not apply. The Plaintiffs have released Agarwal's estate and agreed to "release, acquit and forever discharge . . . [Agarwal, et al] . . . of and from any and all past, present, and future actions, causes of actions [and] third party actions . . . " [See Record No. 121, Ex. 1.] The Plaintiffs have released Agarwal from all liability arising from this incident, and have, in return, received consideration. They have, therefore, executed a clear release of Agarwal, and that release operates to release Powersource from all vicarious liability for Agarwal's negligence. As this is the only claim remaining in this lawsuit, summary judgment is appropriate.

**2.      Indemnification**

The Plaintiffs' release of Agarwal from liability effectively releases Powersource of any vicarious liability, as its alleged negligence was entirely derivative. Alternatively, summary judgment would be appropriate on these claims because the "release of all claims" contains an effective indemnification clause, by which Plaintiffs agree to indemnify Agarwal for any direct or third-party lawsuits which may arise from this incident. The legal effect of this indemnification clause is to release Powersource from liability so as to avoid what the Kentucky courts label the "indemnification/circuity of litigation" problem. *Copeland*, 769 S.W.2d at 69.

Addressing what it considered a "dearth of Kentucky law on the subject," the Kentucky Court of Appeals noted the problems presented when an agent is released from liability but the plaintiff continues against the principal. *Id*. The court adopted the logic of the Illinois Supreme Court, which adopted a Tennessee decision. *Id., citing Holcomb v. Flavin*, 216 N.E. 2d 811, 814 (Ill. 1966), *citing Stewart v. Craig*, 344 S.W.2d 761 (Tenn. 1961). These courts all recognized the difficulties which result when a plaintiff releases and indemnifies the agent from liability, but attempts to reserve the right to proceed against a principal who has no independent liability. In the event the plaintiff was able to recover from the principal, that recovery would be based entirely on the negligence of the agent. The principal would then be entitled to seek indemnity from the agent in the amount it paid the plaintiff. However, the plaintiff, having agreed to indemnify the agent, would be required to essentially substitute itself for the agent, such that the principal would be seeking recovery from the plaintiff in the amount it paid the plaintiff. This

is the "circuity of litigation" that the courts in *Holcomb* and *Stewart* sought to avoid. *Copeland*, 769 S.W.2d at 69 (internal citations omitted).

Kentucky has long abandoned the "clean hands doctrine", so a discussion of how fault would be partitioned between the agent and the principal in a vicarious liability context is unnecessary. *Crime Fighters Patrol v. Hiles*, 740 S.W.2d 936, 939 (Ky. 1987). *Crime Fighters* makes clear that where the defendants are not *in pari delicto*, the less culpable tortfeasor is entitled to contribution from what the courts sometimes term the primary tortfeasor. *Id.*, *citing* Restatement (Second) of Torts, §886(b). More specifically, the Kentucky Supreme Court has explicitly adopted the indemnity argument embraced by *Copeland* in *DeStock #14, Inc. v. Alvey*, 993 S.W.2d 952 (Ky. 1999) – the decision which the Plaintiffs argue supports a denial of summary judgment.

In *DeStock*, a driver and passenger were injured in an automobile accident with a drunk driver. The injured plaintiffs sued both the driver (Logsdon) and the restaurant which, they alleged, continued to serve him alcohol after he became obviously intoxicated. The plaintiffs settled with Logsdon, but continued to press their lawsuit against the restaurant, DeStock. The trial court granted summary judgment to DeStock, "premised upon the theory that the release by [plaintiffs] of Logsdon, who was primarily liable, effectuated a concomitant release of DeStock, which was only secondarily liable." *Id.* at 959. The Kentucky Supreme Court overturned the trial court, finding *Copeland* inapplicable.

Under KRS § 413.241 (a specific statute which governs liability in actions against dram shops), although the driver was primarily liable to the plaintiffs the statute created independent

liability in DeStock for the plaintiffs' injuries. While the court stated that both the hospital in *Copeland* and DeStock were "secondarily liable", "DeStock is regarded as a separate tortfeasor because its liability also depends upon proof that its employees were independently negligent in selling or serving intoxicating beverages to Logsdon." *DeStock*, 993 S.W.2d at 959. However, the court noted that "[DeStock] can be held liable only if Logsdon's negligence caused Reid's and/or Alvey's injuries", similar to the hospital in *Copeland*.

The holding in *DeStock* is inapplicable to this case insofar as any of the Plaintiffs claims which could establish independent liability in Powersource have been decided in Powersource's favor in the Court's April 25, 2006 opinion. [Record No. 119] Absent a specific statute which would create independent liability by making Powersource a separate tortfeasor, Powersource can only be found vicariously liable.

However, *DeStock* is applicable insofar as it upholds the same indemnity logic which underscores *Copeland* specifically and the rule which releases a principal when the agent is indemnified by the plaintiff:

> Logsdon complains that if DeStock is entitled to indemnity against him, he will lose the benefit of his settlements with [plaintiffs]. Perhaps; but he entered into those settlements with knowledge of the existence of DeStock's cross claim for indemnity. Except for the amounts paid, the terms of the settlements are not found in this record, so it is unknown whether the settlement documents include the standard "hold harmless" clause contained in the agreement considered in *Crime Fighters Patrol v. Hiles*, 740 S.W.2d at 937. If so, [plaintiffs] are precluded from any recovery against DeStock; for DeStock would be entitled to indemnity against Logsdon for the amount of that recovery, and [plaintiffs] would be required to hold Logsdon harmless to the extent of the indemnification.

*DeStock*, 993 S.W.2d at 959. The Kentucky Supreme Court is explicitly endorsing the circular indemnity logic which underlies the rule releasing a principal whose liability is vicarious only

when the agent is released from liability. Indeed, the very fact that the court feels compelled to distinguish *DeStock* from *Copeland* implicitly confirms both rationales for the holding in *Copeland*. *DeStock*, 993 S.W.2d at 959.

Having determined that Kentucky recognizes the similar effect of indemnity and release in releasing the principal once the agent has been released, it only remains to be determined if Plaintiffs granted Agarwal indemnity, in addition to release. The Kentucky Supreme Court has adopted the view of American Jurisprudence, Second on Release, which recognizes the distinction between 'release' and 'indemnification':

> 'Release' and 'indemnity' are related, but, nevertheless distinct, legal concepts. A release is a private agreement amongst parties which gives up or abandons a claim or right to the person against whom the claim exists or the right is to be enforced or exercised. In other words, a release is a discharge of a claim or obligation and surrender of a claimant's right to prosecute a cause of action. Indemnity, on the other hand, is a duty to make good any loss, damage, or liability incurred by another. Thus, [a] 'release' and 'indemnity' are distinguishable in that a 'release' extinguishes a claim or cause of action whereas an 'indemnity' arises from a promise by the indemnitor to safeguard or hold harmless a party against an existing or future loss, liability, or both.

*Frear*, 103 S.W.3d at 107 (internal citations omitted). As a common sense reading reveals, the "release of all claims" contains terms of both release and indemnification. The "release of all claims" provides that Plaintiffs:

> release, acquit and forever discharge, release and covenant not to sue. . . [the] Estate of Shalabh Agarwal. . . for, of and from any and all past, present, and future actions, causes of action, claims, demands, damages, costs [and] third party actions[], including but not limited to . . . (2) claims or suits for contribution or indemnity of whatever nature.

[Record No. 121, Ex. 1]. Having agreed to discharge Agarwal from any damages he suffer as the result of a suit or third party action for contribution or indemnity, Plaintiffs have created the

exact circuity of litigation which underlies the rule in *Crime Fighters*. To the extent Plaintiffs were to recover from Powersource on a theory of vicarious liability for Agarwal's negligence, Powersource would be entitled to recover that amount from Agarwal. In the suit for indemnity, Agarwal would, under the terms of the release, be entitled to indemnification from Plaintiffs. Thus, summary judgment for Powersource is also granted on these alternative grounds.

### IV.    CONCLUSION

Accordingly, for the reasons discussed herein, it is **ORDERED** as follows:

(1)    Defendant Powersource Transportation's Motion for Summary Judgment as to the Plaintiffs' Remaining Agency Claim is **GRANTED**. [Record No. 124]

(2)    Defendant Phantom Leasing's Motion for Judgment is **GRANTED**. [Record No. 127] All other motions are denied as moot.

(3)    All claims asserted in this action having been resolved, this matter is **DISMISSED** and **STRICKEN** from the Court's active docket.

This 16th day of June, 2006.

Signed By:
*Danny C. Reeves*  DCR
United States District Judge